Good morning, your honors. May it please the court, my name is Maxine Bailey and I am pro bono counsel for the petitioner, Mr. Santos Antonio Sanchez. The first issue I'd like to address is the Board of Immigration Appeals and Immigration Judge's failure to give reasoned consideration to the highly probative and relevant evidence corroborating Mr. Sanchez's application for deferral of removal under the Convention Against Torture. Mr. Sanchez testified that he fears returning to his native El Salvador because of the tattoos that he has on his body that could be perceived as gang related and also his status as a deportee should he be returned to El Salvador. He fears torture, death, and other abuse by the El Salvadoran police or death squads that the government cannot control in El Salvador. To corroborate his testimony, he submitted substantial evidence including a country conditions report, news articles, and also an extensive report done by the Harvard Law School, a well-respected academic institution, that set forth extensive documentary evidence concerning how deportees with gang related tattoos or young men who are even perceived to be related to gangs or involved in gang activity are routinely arrested, beaten, held in deplorable conditions, and even killed by vigilante death squads. Are these specific enough to bear on you? I mean the study was based on a few cases and you also generalized a few cases, but there's nothing specific about your client. Well, my client, I believe, falls into the same category of these men that the study did look at. He's 26 years old. He has tattoos that can be perceived as gang related. If he's deported to El Salvador, he'd be facing the same kind of risk of abuse, torture, detention that these same young men that the study was looking at would fall under. Why do you say that the immigration judge didn't consider this study? The immigration judge said that she had considered all the evidence, even that that she wasn't specifically drawing attention to. That is correct, Your Honor. She did state that. However, her opinion spanned 12 pages. Her specific referral to his application for Convention Against Torture and her consideration of that consisted of one paragraph. Now this court's holding in Aguilar v. Holder stated that evidence of country conditions alone can meet the applicant's burden of proof under the Convention Against Torture. There was a State Department country conditions report, right? I'm sorry, Your Honor? There was a State Department country conditions report. It was a State Department country conditions report. We haven't extended it to reports of private groups. Your Honor, in Colby v. Holder, the court also mentioned Cole's submission of news articles that corroborated his claim and also reminded us that the Convention Against Torture regulations require consideration of all evidence that's probative in these claims. And in Colby v. Holder, the court held that a blanket statement, a general statement that all evidence is considered may be enough to show that the evidence was considered. However, if there is anything to show that probative evidence was not considered, then the case should be remanded. Was it the study or the country conditions report that mentioned the mano dura, the El Salvadorian law? I believe both of them did. And the immigration judge made specific reference to that and said, despite that, I don't find that the petitioner qualified for... You know, I think she gave, you know, brief reference to that, but... But she mentioned it. She did mention it, but she didn't... Isn't that some acknowledgement that she looked at the materials that you're saying that she didn't give adequate consideration to? I believe she didn't. You know, she spent one paragraph talking about this cat claim. She went... You know, she gave extensive reasoning of why he wasn't eligible for asylum, that his conviction was for an aggravated felony. And the Convention Against Torture claim was the one claim that he had left after all those findings. And there was one paragraph dedicated to this. There was no mention... What did the country conditions report show about this particular issue? The country conditions report just mentioned that these death squads still continue, that there is violence against people who are perceived to be gang members. It didn't go into the same amount of detail that the Harvard report does. And country conditions reports, you know, they cover a lot of ground. And, you know, they didn't go into it as extensively as this report did and the other news articles, excuse me, that he also submitted. Is there anything in the record that describes the tattoos? I'm concerned that the standard might be if you're El Salvadorian and you're here illegally and you have a tattoo, all of a sudden you qualify. What does it mean to say it could be perceived as gang tattoos? Sanchez testified that his tattoos came from... He had them done on a few different occasions. One has initials MS, which could be perceived as affiliated with the gang MS-13. But he testified that the initials were his daughter's initials. And his wife's. And his wife's, yes, Your Honor. The other tattoo that he described was something that he received when he was... that could be perceived as affiliation with the Southside gang. But he testified that he was sort of involved with the gang, but he never jumped in, so to speak. He was never initiated into the gang. And he was not really ever a full gang member. And in Aguilar, the petitioner there had similar tattoos that could be perceived as gang-related. And in Cole, the petitioner was actually a member of the Crips gang, and his whole body was covered in tattoos. But I think the point of the reports show that any tattoos that can be perceived as gang-related, society, the police, once they perceive you with that and having any of these tattoos... Where on his body are they? I believe on his arms and his back. So with the arms, you know, El Salvadorian... In Aguilar-Ramos, was there expert testimony provided at the... There was expert testimony, and there was also a... I think it was the 2005 country conditions report. And the IJ and BIA found that the expert testimony was not sufficient to corroborate Aguilar-Ramos' claim, but the Ninth Circuit found that the Department of State report did corroborate the testimony, and that that report alone... Of the experts. Of the experts, and Aguilar-Ramos. And the court found that even if testimony alone didn't corroborate the claim, the country conditions report does, and that it should be remanded for the Board of Immigration Appeals to look at that issue again. So with my time remaining, I'd like to... The public need never see his back. And even arms can be covered with sleeves. They can, Your Honor, but from what I understand... And even if... The report also talks about tattoo removal. You know, even if the tattoos are removed, that leaves scarring. But if anyone sees those tattoos at all, that's it. You're perceived as a gang member, and it's really difficult to come out of that perception. Even these people that the report describes as having tattoos removed or going through rehabilitation, getting involved in society in a positive way, they're still negatively perceived by the society, the police, and these death squads that go after these young men. Did you want to say two minutes or a little? Yeah, I just wanted to cover the aggravated felony issue. Sorry, Your Honor. Okay. The immigration judge and board found that Sanchez's conviction for assault was an aggravated felony crime of violence as defined by 18 U.S.C. section 16B. And under Taylor, we need to look at... Under which he was convicted with section 16B. And section 16B requires that the statute show a substantial risk that use of force would be used in committing this offense. The Oregon statute only requires an intentional or knowingly causation of injury. It does not state anywhere the use of force. The respondent brought up the case of juvenile female versus U.S. That statute actually used the word forcibly assault. And in Leocal, the Supreme Court reminded us that in looking at these offenses, it's not that the possibility of harm from the conviction, but that the risk of force will be used. And in this case, under this statute, it's not clear that there's a substantial risk that force will be used. All that is required is that injury result. So... Well, it's not exactly injury results. It's that the defendant must have inflicted injury, right? That's what the state's highest court has said about this statute. Inflicted injury, yes, but that does not... You can still inflict injury without the use of force, is the point. And in Leocal, that's what the court discussed, that just because injury is caused, it does not mean that force is used to cause that injury. So it's a myth that the conviction is not an aggravated felony. Thank you very much. Thank you. We'll hear from the governor. Good morning, Your Honors. May it please the Court. My name is Stephanie Savorn, and I'm an attorney with the U.S. Department of Justice, and I represent the government in the matter. There are two issues before the Court. The first is a crime of violence action committed by Mr. Sanchez. It is the government's contention that Mr. Sanchez's conviction for a third-degree assault under Oregon Revised Statute 163.165e is a crime of violence according to Title 18 U.S.C. subsection 16b. The second issue is whether or not substantial evidence compels a reversal of the agency's denial of deferral of CAT. First, the standard review for reviewing the denial of deferral of CAT is whether an applicant has demonstrated a clear probability of future torture. This is a factual finding, and the standard of review is very high for this. I understand the petitioner's argument to be that that's as much an evidentiary argument as failure to comply with required legal rules. That is, you've got to give reason to explanation. Right, and it is government's contention that the agency gave reason to explanation. As stated by petitioner, the immigration judge admitted – Why wasn't this Harvard study and the country conditions report potentially helpful or dispositive evidence for the petitioner? Sure. First, the State Department of Report. Overall, first, let me say as an initial matter that petitioner consents that there was substantial or voluminous evidence that supports the contention for deferral of removal. However, submitted into the evidence was only the 2007 country report and 11 other media documents. The government contends that about nine of those have very little bearing on the case. They describe in general the gangs in El Salvador, the violent situation in El Salvador, and the situation surrounding tattoos. But it doesn't go to the issue of whether or not the government in El Salvador acquiesces, consents, or tortures persons who have these tattoos. Now, the Department of State report for 2007, it says within there the constitution prohibits torture and that also prohibited is arbitrary arrest and detention. Further and more, there's not much indication to suggest that the government consents or acquiesces to torture. There is one notation that the PNC, which is the police force of El Salvador, is involved in unlawful killings. According to the Office of the Inspector General for the PNC, there have been 26 unlawful killings by the PNC. However, it doesn't say what the circumstances around these were, who the victims were, whether or not they were gang members. In the one portion of the country report that goes a little bit more into the detail, it says that one of the persons was a sergeant who was a member of the PNC and that he was involved in the murder-for-hire killing of an alleged gang member. However, it also says that the government brought forth a charge of homicide against him and also arrested several other persons who were perhaps involved in covering up or creating obstacles to the investigation into this homicide. Therefore, the record indicates that the government has taken a proactive approach against these people. As far as the Harvard Law Review article, there is evidence that people who are deported from the U.S. to El Salvador and have belonged to a gang or had tattoos are being detained by the police. But as an initial matter, the police are acting pursuant to the anti-gang law. They're taking these people in and charging them, since El Salvador has made it a crime to be a member of a gang. There are instances in which they have been harassed and abused by police, but this is not sufficient to constitute torture. There's also evidence that there's a strong indication that death squads are operating against gang members. And while gang members say that PNC police officers have been involved in such, they haven't actually, there's nowhere actual evidence to support this indication. Second, it's the government's contention. So why wasn't the IALJ required to sort of address those matters? The IJ, first of all, she said that she has considered all of the evidence. She didn't explicitly say such. And the agency, especially the board, found that this was sufficient because petitioner below, on appeal to the board, had not even raised as an issue that the IJ had failed to consider all of the evidence. Well, the only thing that concerns me about this case is what we said recently in Cole v. Holder, where we said, in particular, where potentially dispositive testimony and documentary evidence is submitted, the BIA must give reasoned consideration to that evidence. And it's the government's contention that the evidence submitted by petitioner was not potentially dispositive, that there was nothing really on point to what is at issue here, which is whether or not El Salvador acquiesces or consents to the torture. Okay. Now, with regards to the Organized Revised Statute 163.1.65e, which petitioner was convicted of, that requires... You know, I have a little bit of a question with the government's position as to how it's studied. I mean, this is something done in Cambridge based on, what, interviews with some individuals? I mean, they go down to El Salvador, especially now? I believe so. They go down to El Salvador in their personal interviews, so it's... You conduct them down there? Right. That's my belief, but I'm not 100% certain on that. Is the government in a position as to what this kind of study, what kind of evidence this is? I mean, there are no... I mean, as best I can tell, there's no sworn declarations or anything else. No, there's not. Versus this court has held that the country reports are really probative evidence. But the government didn't, at the hearing, the government didn't object. There was no objection to this particular document. Not at all. Right. Not at all. It was submitted as evidence. Or to the newspaper articles that were submitted and whatnot. Not at all. Okay. But we're talking about whether this is probative evidence. Right. And I'm just wondering what status this has. Well, it's whether or not it's potentially dispositive evidence, which is what my understanding is. And as the government has said before, a lot of it... I mean, I acknowledge that this recent coal relies heavily on the earlier case. What was it called? Aguilar-Ramos? Right. Which, in that case... There was expert testimony. There was expert testimony. And the country conditions report was a bit more specific. Right. But nonetheless, you have this Harvard study here, which is pretty significant for this particular country. Right. Well, as a first point, in Aguilar-Ramos, the immigration judge never said explicitly that I have considered all the evidence, which is quite different from here. The immigration judge explicitly on page two of our decision said, I covered all the evidence, here's the evidence that I admitted into the record, including the pre-hearing statement, which includes the country report and all the media reports. Now, the pre-hearing statement was submitted approximately four months before the hearing, which then leads to the indication that the immigration judge had the time to go through all of this evidence. Furthermore, the immigration judge took the time to issue a written decision in this case. Therefore, the fact that she said, I considered all of the evidence, is indicative of the fact that she went through the country report and she went through all of the human rights articles. Okay. Thank you. If you don't have any further questions, I'll briefly conclude. Did you want to say anything on the other issue? Please. Furthermore, it's the contention that the third degree assault, by its nature, involves a substantial risk that physical force against a person or property of another may be used in the course of committing the offense. The government believes that juvenile female is controlling on this case. In that case, the juvenile female was convicted under 18 U.S.C. 111. And there, the assault definition was very similar to the assault definition in Oregon statute. And the court said, because the offense is a felony, Section 16B also applies, and because it sweeps more broadly than Section 16A, it encompasses offenses where a person merely disregards a risk that physical force will be used in commission of the offense. As such, this crime will always involve a substantial risk that physical force against a person may be used, even if physical force is not an element of the offense. As such, the government contends that Mr. Sanchez has been convicted of a crime and violence is removable, and the court should deny the instant petition for review. Thank you. Does that put us in conflict with the Second Circuit in Chernovsky? In Chernovsky, that case, first of all, it's not binding on this court because it is a Second Circuit decision. In that case, the petitioner also was convicted of a misdemeanor. Therefore, the analysis was under 16A and 16B, which deals more of whether or not the physical use of force was an element of the offense and not whether or not there's a substantial risk by the nature of creating the offense or committing the offense that physical force will be used. Okay, thank you. Thank you. Okay, cases are able to stand submitted.
judges: Burns, Kozinski, Paez